TRACY L. WILKINSON
United States Attorney
SCOTT M. GARRINGER
Assistant United States Attorney
Chief, Criminal Division
JONATHAN GALATZAN
Assistant United States Attorney
Chief, Asset Forfeiture Section
MAXWELL COLL (Cal. Bar No. 312651)
Assistant United States Attorney
Asset Forfeiture Section
    1400 United States Courthouse
    312 North Spring Street
    Los Angeles, California 90012
    Telephone: (213) 894-1785
    Facsimile: (213) 894-0142
    E-mail: Maxwell.Coll@usdoj.gov

Attorneys for Plaintiff
UNITED STATES OF AMERICA

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

SOUTHERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | No. 8:22-cv-00316 |
| Plaintiff, | VERIFIED COMPLAINT FOR FORFEITURE |
| v. | 18 U.S.C. §§ 981(a)(1)(C) and 984 |
| $2,190,317.21 IN BANK FUNDS SEIZED FROM CHASE BANK ACCOUNT '7226 AND $266,163.60 IN FUNDS SEIZED FROM ESCROW ACCOUNT EG-16118418-TP, | [FBI] |
| Defendants. | |

Plaintiff United States of America brings this claim against the below-identified defendants, and alleges as follows:

**JURISDICTION AND VENUE**

1. The government brings this in rem forfeiture action

pursuant to 18 U.S.C. §§ 981(a)(1)(C) and 984.

2. This Court has jurisdiction over the matter under 28 U.S.C. §§ 1345 and 1355.

3. Venue lies in this district pursuant to 28 U.S.C. § 1395.

**PERSONS AND ENTITIES**

4. The plaintiff in this action is the United States of America.

5. The defendants in this action (collectively, the "Defendant Funds") are the following:

a. $2,190,317.21 from Chase Bank account number ending in '7226, (the "Chase '7226 Account")[1] seized on or about November 3, 2021, during the execution of a federal seizure warrant, held in the name of National American Capital LLC ("NAC"), at the Chase Bank retail branch located at 2220 N. Bellflower Blvd., Long Beach, California; and

b. $266,163.60 in funds from escrow account EG-16118418-TP (the "Escrow Account") seized on or about October 4, 2021, during the execution of a federal seizure warrant, held by Stewart Title of Sacramento for BNZ One Capital LLC ("BNZ"), at Stewart Title of Sacramento located at 1180 Iron Point Rd., Folsom, California.

6. The Defendant Funds are currently in the custody of the United States Marshals Service within this District, where they shall remain subject to this Court's jurisdiction during the pendency of this action.

7. The interests of Brett Reed Barber ("Barber"), NAC, Louis

---

[1] Pursuant to Local Rule 5.2-1, only the last four digits of bank account numbers are set forth in this Complaint.

Zimmerle ("Zimmerle"), and BNZ may be adversely affected by these proceedings.

## BASIS FOR FORFEITURE

*Background on Scheme to Defraud Investors*

8. Beginning no later than in or around May 2019, and continuing to at least October 2021, in Orange County, within this District, Barber devised, participated in, and executed a scheme to defraud individual investors.

9. Specifically, Barber, Zimmerle, and other co-conspirators solicited individual investors to invest with BNZ. Investors were promised guaranteed returns of between 8 percent and 10 percent per year. To make the payments promised to earlier investors, Barber, Zimmerle, and other co-conspirators would solicit new investors. Many of the investors solicited had a preexisting relationship with Barber, Zimmerle, or other co-conspirators through prior investments or insurance contracts that Barber, Zimmerle, or other co-conspirators had sold to the investors.

10. In soliciting investors to BNZ, Barber, Zimmerle, or other co-conspirators would falsely represent that BNZ was in the business of buying and developing real estate projects and flipping real estate, that is, purchasing real estate for below market value and selling it for a higher value. Barber, Zimmerle, or other co-conspirators falsely represented to investors that they would receive a guaranteed rate of return on their investments between 8 percent and 10 percent, which would be paid out monthly, quarterly, or yearly, as well as potential bonuses based on the success of the real estate development projects and sales.

11. Barber represented to investors that the investment was "safe" and "FDIC insured."

12. Barber also failed to disclose to investors that he had previously been barred for life from acting as or associating with a broker-dealer by the Financial Industry Regulatory Authority ("FINRA").

13. In truth, while BNZ purchased some real estate, it did not actually take any substantial steps toward development of parcels, nor did BNZ flip real estate for a profit. Rather, BNZ primarily used investor funds to (1) pay Barber, Zimmerle, or other co-conspirators; (2) purchase the homes in which Barber and Zimmerle resided; and (3) repay earlier investors with new investor money. Further, the investments were always at risk and never "safe" or "FDIC insured."

14. During the course of the fraudulent scheme, Barber, Zimmerle, or other co-conspirators solicited or caused to be transferred to BNZ approximately $13,800,000 from victim investors.

*Victim Interviews Demonstrate Scope of Fraud*

15. In carrying out its investigation, FBI investigators interviewed several victims of the BNZ scheme.

Interview of J.J.

16. FBI special agents interviewed victim J.J.[2] J.J. met Barber because J.J. was a friend of a family member. Barber convinced J.J. to move money from an annuities account to invest in

---

[2] Victims are referred to herein by their initials only in order to protect their identity

BNZ.  Barber stated that the investment was safe, had a guaranteed return of 8 percent to 10 percent annually, and that some of the investments were FDIC insured.  J.J. invested approximately $820,000.  Barber and Barber's wife also tried to convince J.J. to enter into a reverse mortgage and invest more money in BNZ.  J.J. declined.

<u>Interview of E.L.</u>

17.  FBI special agents interviewed E.L. of Arizona.  E.L. was introduced to Zimmerle through a real estate agent.  Zimmerle claimed to be a real estate developer with BNZ and explained that BNZ had real estate projects and real estate deals all over California.  E.L. entered into a 1031 real property swap with BNZ in hopes of avoiding significant capital gains taxes from the sale of a house.[3]  E.L. partnered with BNZ and purchased undeveloped land in the Sacramento Valley for $1 million.  BNZ owned 30 percent of the land, and E.L. owned 70 percent of the land.  E.L. received a promissory note paying 8 percent annually with interest payments made monthly.  E.L. received monthly updates on the real estate development project from Zimmerle.  Zimmerle advised E.L. that four lots were sold for $1 million.  No such lots were sold.

<u>Interview of B.J. and A.J.</u>

18.  FBI special agents interviewed B.J. and A.J. of California.  Barber had acted as B.J.'s and A.J.'s investment broker for five years.  B.J. had retirement savings in an annuity and another investment.  Barber convinced B.J. to move all of the retirement

---

[3] A 1031 exchange gets its name from Section 1031 of the U.S. Internal Revenue Code, which allows capital gains taxes to be deferred.

savings money to BNZ. Barber stated that the guaranteed annual return rate of 10 percent would be generated by real estate investments, flipping properties, and investment in hedge funds. Barber assured B.J. and A.J. that the investment was safe and that the funds were FDIC insured. B.J. invested approximately $320,000 with BNZ. A.J. invested approximately $30,000 with BNZ. Barber's wife approached A.J. and B.J. about doing a reverse mortgage on their home so they could invest more funds in BNZ. A.J. and B.J. declined to participate in a reserve mortgage on their home.

<u>Interview of L.W.</u>

19. FBI special agents interviewed L.W. of California. L.W. invested approximately $400,000 in or around 2008 with Barber. L.W. met Barber during a meeting regarding the creation of a trust. Barber offered investments to L.W. Barber had a copy of L.W.'s electronic signature and used that electronic signature to authorize the withdrawal of $180,000 from L.W.'s annuity investment and into BNZ. L.W. did not know about the investment change and did not authorize it. L.W's daughter discovered what happened, threatened suit against Barber, and reached a settlement with Barber to have the investment returned.

<u>Interview of S.V. and R.V.</u>

20. Victim S.V. was interviewed by the FBI and told the interviewing agent that S.V. and her husband R.V. had invested approximately $1,000,000 with Barber through his company NAC. S.V.'s daughter is best friends with Barber's daughter and attends high school with Barber's daughter. S.V. was laid off from her teaching job at the start of the COVID-19 pandemic. The Barbers hired S.V. to

be a teacher for the Barbers' children during the pandemic. Because of their relationship with the Barbers, S.V. and R.V. did not do any due diligence on Barber. Barber told S.V. and R.V. that Barber had a safe investment for them and that by investing with his company, NAC, S.V. and R.V. would earn guaranteed returns of 10 percent per year. They were told that NAC invested in commercial real estate in California. Barber explained the investment would have no risk because California real estate is strong and does not lose money. A no-risk investment was important to S.V. and R.V. because they had been invested for approximately 10 years in a low-risk portfolio, which they communicated to Barber. Barber explained he was a middleman and would not hold S.V. and R.V.'s money, but instead the funds would be invested in commercial real estate and managed by third parties. Barber did not disclose his FINRA ban, nor did he disclose the ongoing investigation by the FBI or the SEC into Barber's activities with his previous company, BNZ. Had this information been disclosed, S.V. and R.V. would not have invested with Barber.

Interview of V.G.

21. Victim V.G. was interviewed by the FBI, at which time V.G. told the interviewing agents that V.G had financial power of attorney for her parents, R.H. who was 87 years old, and S.H. who was 84 years old. R.H got very sick at the beginning of 2021 and, in order to keep up with R.H.'s medical bills, R.H. and S.H had to sell their home. V.G. moved her parents into an assisted living facility. V.G. followed her father's wishes to have their money invested with Barber. R.H. and S.H. had always invested in annuities, which they

believed to be very safe. R.H. wanted to invest the proceeds from the sale of the house with Barber in an investment which provided R.H and S.H. a monthly income stream. Barber met R.H., S.H., and V.G. at R.H.'s retirement home with a notary. Barber stated the investment was safe, it paid a guaranteed return of 10 percent, and the returns were paid out monthly. At the end of the term of the investment, the principle would be returned. V.G. confronted Barber about being a principle in NAC. Barber explained that NAC was just a middleman for the investment and the money would be invested with a third party. V.G. invested $400,000 on or about May 1, 2021, for the benefit of her parents for a term of 10 years. Barber had S.H. sign numerous of documents without V.G. present. Barber did not disclose that he had been barred by FINRA from dealing in securities. Barber did not disclose the ongoing SEC investigation against Barber and his company, BNZ. Had this information been disclosed, V.G. would not have allowed V.G.'s parents to invest.

<u>Interview of A.G.</u>

22. During an interview by the FBI, Victim A.G. told the interviewing agents that A.G. learned of the investment opportunity with Barber through his sister-in-law, who had been invested with Barber for several years in his company BNZ. A.G. had IRA investments which were not growing and was looking for an investment in real estate. A.G. had a conference call with Barber and Barber explained that NAC invested in residential and commercial real estate in California. NAC would buy undervalued properties then either flip the property for a profit or hold the property and use the value in the property to invest in other properties. NAC paid returns of 5

percent to 10 percent, with 10 percent being the standard return. Barber stated that A.G.'s returns would never be negative. The investment was made in both A.G's name and A.G.'s partner's name, E.G. Barber explained that some of the money A.G. and E.G. invested would be invested in NAC and some would be invested in BNZ. A.G. is not sure how much money was invested in each company because Barber had not provided a breakdown of how the investment was split even though A.G. had asked many times. Barber never disclosed that he was barred from dealing in securities by FINRA. Barber never disclosed the ongoing investigation by the SEC into his activities with his previous company, BNZ. Had this information been disclosed, A.G. would not have invested with Barber. A.G. and E.G invested a total of $58,564 with Barber, which A.G. considered a big investment. This is all the retirement money A.G. and E.G saved.

<u>Interview of M.M.</u>

23. Victim M.M. was interviewed by the FBI, at which time M.M told the interviewing agent that she invested approximately $100,000 with Barber through NAC. M.M.'s daughter had invested with Barber in BNZ and the investment had performed well. M.M. trusted Barber because of his relationship with her daughter. Barber stated that NAC invested in real estate and the investment paid 10 percent annual returns which would be paid monthly. M.M. liked the monthly income stream from the investment. M.M.'s husband died in February 2021, and she told Barber that the money being invested with NAC was her retirement nest egg. Barber explained that while the investment had risk, he would make sure her money was safe. Barber never disclosed his ban from selling securities by FINRA and did not disclose the

ongoing SEC investigation into his previous company, BNZ Capital. Had M.M. known this information, she would not have invested with Barber in NAC.

*The Defendant Funds Are Proceeds of the Fraudulent Scheme*

24. FBI agents reviewed bank records for the Chase '7226 Account that NAC maintained at Chase Bank for the period between February 2021 and September 2021. FBI agents discovered that the account was opened on February 23, 2021, in the name of NAC, using an address in Newport Coast, California, with Barber as the only signatory on the account.

25. Between February 2021 and September 2021, deposits into the account totaled $4,461,508.98, which included approximately $4,396,512.86 in investor funds, from more than 20 investors, which made up more than 98.5 percent of the funds deposited into the account. Investors were told they would receive a guaranteed 10 percent return on their money which would be paid monthly. A review of the bank statements shows limited investments by NAC and no revenue generated from the limited investments the company made. Some 98.5 percent of the funds deposited into the account were from investors. Therefore, the monthly payments made to investors as interest payments on their investment were actually payments made by NAC with other investor money, not business returns generated by NAC.

26. FBI agents also discovered that on September 17, 2019, BNZ wired $239,483.55 into Escrow Number EG-16118418-TP to Stewart Title of Sacramento. According to information provided by Stewart Title of Sacramento, this Escrow account was for the purchase of 506 3rd Street, Galt, California, 95632, of which BNZ is a 50 percent owner.

1    27.  On or about September 20, 2021, FBI agents learned that BNZ
2 was selling its 50 percent interest in the property for $270,000.00.

### CLAIM FOR RELIEF

4    28.  Plaintiff incorporates the allegations of paragraphs 1-27
5 above as though fully set forth herein.

6    29.  Based on the above, plaintiff United States of America
7 alleges that the Defendant Funds represent proceeds traceable to
8 violations of 18 U.S.C. § 1343 (wire fraud).  The Defendant Funds are
9 therefore subject to forfeiture pursuant to 18 U.S.C. § 981(a)(1)(C).
10 In addition, to the extent that the Defendant Funds are not the
11 actual monies directly traceable to the illegal activity identified
12 herein, plaintiff United States of America alleges that the Defendant
13 Funds are identical property found in the same account or place as
14 the property involved in the specified offense, rendering the
15 defendant funds subject of forfeiture pursuant to 18 U.S.C. § 984.

WHEREFORE, plaintiff United States of America prays:

(a) that due process issue to enforce the forfeiture of the Defendant Funds;

(b) that due notice be given to all interested parties to appear and show cause why forfeiture should be not be decreed;

(c) that this Court decree forfeiture of the Defendant Funds to the United States of America for disposition according to law; and

(d) for such other and further relief as this Court may deem just and proper, together with the costs and disbursements of this action.

Dated: February 28, 2022

TRACY L. WILKINSON
United States Attorney
SCOTT M. GARRINGER
Assistant United States Attorney
Chief, Criminal Division
JONATHAN GALATZAN
Assistant United States Attorney
Chief, Asset Forfeiture Section

*/s/ Maxwell Coll*
MAXWELL COLL
Assistant United States Attorney

Attorneys for Plaintiff
UNITED STATES OF AMERICA

**VERIFICATION**

I, Timothy A. Jacoby II, declare that:

1. I am a Special Agent of the Federal Bureau of Investigation.

2. I have read the above Verified Complaint for Forfeiture and know its contents. It is based upon my own personal knowledge and reports provided to me by other law enforcement agents.

3. Everything contained in the Verified Complaint for Forfeiture is true and correct, to the best of my knowledge and belief.

I declare under penalty of perjury that the foregoing is true and correct.

Executed __February 28__, 2022 in Los Angeles, California.

*Timothy A. Jacoby II*
TIMOTHY A. JACOBY II
Special Agent
Federal Bureau of Investigation